E-FILED
Friday, 21 December, 2018 10:20:38 AM
Clerk, U.S. District Court, ILCD


UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JAMES ATWOOD,

Defendant.

Docket No. 16-20043

Urbana, Illinois
May 11, 2018
10:34 a.m.

SENTENCING HEARING

BEFORE THE HONORABLE COLIN S. BRUCE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiff: BRYAN DAVID FRERES, ESQUIRE
Assistant United States Attorney
201 South Vine Street
Urbana, Illinois 61802
217-373-5875

For the Defendant: HARVEY C. WELCH, ESQUIRE
Law Offices of Harvey C. Welch
159 Lincoln Square
Urbana, Illinois 61801
217-367-3200

Court Reporter: LISA KNIGHT COSIMINI, RMR-CRR
U.S. District Court
201 South Vine, Suite 344
Urbana, Illinois 61802

Proceedings recorded by mechanical stenography; transcript produced by computer.

(In open court, 10:34 a.m.)

COURTROOM DEPUTY: This is in Case Number 16-20043-01, United States of America versus James Atwood.

THE COURT: All right. The United States is represented by Assistant U.S. Attorney Bryan Freres.

The defendant's represented by his attorney, Harvey Welch. The defendant's present. He's in custody.

Probation Officers Genise Bailey and Gwen Powell are also present in the courtroom, from the Probation Office.

All right. Now, we've gone through several attempts at doing a sentencing, so I'm going to start from the top. Mr. Freres, have you had a chance to read and review the revised presentence report?

MR. FRERES: Yes, Your Honor.

THE COURT: And just so the record is clear, I'm not going to keep saying which version of it. We've had five revisions; so when I say "PSR," as to both sides, I'm talking about the fifth revised version. That's what you've had a chance to read and review, correct?

MR. FRERES: I have it right here. Yes, sir.

THE COURT: All right. Now, I believe in this version the government has no objections; is that

correct?

MR. FRERES: I don't believe we've had any objections throughout, Your Honor.

THE COURT: I don't think so either; but, again, I'm trying to focus -- on any of the iterations, have you had any objections? And I think the answer is no.

MR. FRERES: That's correct.

THE COURT: Do you have any evidence you intend to present in aggravation?

MR. FRERES: Yes, Your Honor. We do intend to present a little bit of evidence that may also relate to one of the objections as well, related to the leadership enhancement.

THE COURT: Related to the --

MR. FRERES: Leadership enhancement. It's a video from the buy, basically, that underscored this event.

THE COURT: All right. And is this a downward departure case or not?

MR. FRERES: No. It is not, Your Honor.

THE COURT: All right. Now, Mr. Welch, I know that, based on different things you filed, I know you've reviewed some of the previous versions. Have you had a chance to go through all five versions of the revised

presentence report?

MR. WELCH: Yes.

THE COURT: Have you had a chance to go over them with Mr. Atwood?

MR. WELCH: Yes.

THE COURT: Now, I've reviewed again -- let me say because I reread them before. I took the time on Sunday to -- strike that. On Wednesday. On Wednesday I went back through and read all of the letters that were filed on behalf of the defendant, document 84. There's some 40-plus pages and certificates and other things. I read all those.

I've reread all the pleadings filed by the defendant entitled "Memorandum." Some of them are simply objections. I've read all of those.

Do you have any other evidence you intend to present in mitigation?

MR. WELCH: Your Honor, I have an exhibit.

THE COURT: All right. Do you want to file that at this time?

MR. WELCH: Yes, please.

THE COURT: Has the government been provided a copy? Do so at this time.

MR. WELCH: I'm going to provide them with a copy. It relates to the prior drug convictions.

THE COURT: Okay.

(Brief pause in proceedings.)

THE COURT: All right. The Court has received Defendant's Exhibit 1, consisting of two pages relating to two, two separate cases from Kankakee County. All right.

Now, we'll go through the objections here in a moment.

Are there any additional objections that you're aware of, Mr. -- I mean, just for the record, are there any additional objections that are not encompassed within one of the five different versions of the revised presentence report?

MR. WELCH: Yes, there are, Your Honor.

THE COURT: There are more. All right.

MR. WELCH: Just -- some minor corrections. The -- in paragraph 62 --

THE COURT: All right. Give me a second to go to that one. Okay. In paragraph 62. All right.

MR. WELCH: Just to make it clear, Your Honor, Ms. Scheppler and the children all reside with the defendant's mother at that address that's listed. It seems to indicate only the children live with their grandmother.

THE COURT: So I will amend the PSR so it says,

"these children and Ms. Scheppler" -- I've now put that in the PSR by interlineation -- "reside with the defendant's mother in Arizona."

(Brief pause in proceedings.)

THE COURT: Take your time.

MR. WELCH: Then paragraph 77.

THE COURT: 77, yes.

MR. WELCH: Your Honor, that should be corrected to state that he used LSD on a monthly basis at, during the ages specified, and not PCP.

THE COURT: Okay. I will change it to lysergic acid diethylamide, LSD.

MR. WELCH: In paragraph 105 --

THE COURT: Paragraph 105.

MR. WELCH: -- on page 20, --

THE COURT: All right.

MR. WELCH: -- Mr. Atwood disputes the characterization that he has a history of violence.

THE COURT: I will strike out the last sentence. That's, of course, an interpretation. I'll just white that out because it's inconsequential in terms of whether I would impose that condition, which I would anyway. All right.

(Brief pause in proceedings.)

MR. WELCH: And then the last objection, Your

Honor, would be to paragraph 37 and 40, the awarding of points.

THE COURT: Wait a second. So we're going backwards now --

MR. WELCH: I'm sorry.

THE COURT: -- to paragraph 37?

MR. WELCH: Yeah.

THE COURT: Yes.

All right. What's the problem with paragraph 37?

MR. WELCH: Your Honor, Mr. Atwood says he was not represented by counsel; and, therefore, he's objecting on that basis to the point award there.

THE COURT: Mr. Freres, before I get into the merits of that objection, does that at all affect whether or not the defendant is a career offender?

MR. FRERES: No. And it won't affect -- because he's a career offender, it doesn't impact his criminal history either.

THE COURT: Right. That's -- your answer was better than the way I phrased the question. He's a criminal history VI as a career offender, so that doesn't affect --

MR. FRERES: That's correct.

THE COURT: -- the appropriate guideline range.

MR. FRERES: And, again, while I think it's pretty clear the probation office has dug up he was represented on this, it doesn't matter; so I don't have a problem, given he is a career offender.

THE COURT: Well, I also want it to be accurate, so let me ask Ms. Bailey: I think this objection was mentioned in one of the prior pleadings.

PROBATION OFFICER BAILEY: It is, Your Honor, and I furnished Mr. Welch a docket sheet showing that he was.

THE COURT: He was -- the defendant was represented by counsel?

PROBATION OFFICER BAILEY: Yes. Yes, sir.

THE COURT: Well, the probation officer says the docket sheet -- do you have a copy of that available?

PROBATION OFFICER BAILEY: I do.

(Brief pause in proceedings.)

THE COURT: Take your time.

(Brief pause in proceedings.)

THE COURT: All right. I'm looking at the appropriate docket sheet with the same case number, 04-CM-265.

(Brief pause in proceedings.)

THE COURT: What it reflects is the --

(Brief pause in proceedings.)

THE COURT: All right. In the 04-265, criminal misdemeanor, Kankakee County, the docket reflects that the defendant was represented by Mr. Glazer, a public defender it appears, throughout the proceedings until the end; and then the last sheet on the docket indicates that Defendant was appearing pro-- actually, I don't know how to read this.

So the record is clear, the docket I'm looking at is from December 8, 2005. It says that the case was called. Assistant State's Attorney Holland, I believe is the name -- it could be Helland, H-e-l-l-a-n-d; it could be Holland -- appears for the State. Defendant appears pro se with counsel. I'm reading verbatim. "Defendant appears pro se with counsel. Defendant pleads guilty; admonished and persists. Plea accepted and conviction entered at this time. Defendant is placed on two years court supervision upon the conditions," et cetera, et cetera.

I don't know what that means. And as Mr. Freres said, it's irrelevant. So throughout the proceeding, it looks like he was represented by a federal -- excuse me, by a public defender, Mr. Glazer, G-l-a-z-e-r. But it's irrelevant whether he was there at the end since the docket says he was pro se with counsel. So I will simply note that, on the PSR, that -- it's not

clear whether counsel was present for that based upon the docket, which -- Mr. Freres, do you know how someone appears pro se with counsel?

MR. FRERES: I know, Your Honor, when defendants oftentimes decide they want to represent themself, the Court, in the defendant's interests, often will appoint standby counsel. I do not know the circumstances on this. I know this Court has done that in the past. I would presume that's the case.

But, again, this is irrelevant, and I don't see that going down this rabbit hole is necessary today.

THE COURT: Yeah. I don't think so either.

Mr. Welch, do you know anything about appearing pro se with counsel? I mean, my understanding would be it might be standby counsel; it might be a typo. I don't know. Or do you --

MR. WELCH: I think it may be a typo. Mr. Atwood persists in his representation that --

THE COURT: He was pro se.

MR. WELCH: -- he did that case himself.

THE COURT: In either event, you agree with Mr. Freres that, as a career offender, it's a VI anyway, so it doesn't matter anyway?

MR. WELCH: Subject to -- yes. Subject to our other objections, correct.

THE COURT: Right. We'll talk about those in a minute.

MR. WELCH: Right.

THE COURT: So I'll put that down as a zero and then indicate that potentially it's not going to affect the amount. All right.

What else do you have, Mr. Welch?

MR. WELCH: And then on that, that same -- excuse me, on that same page, paragraph 40, Mr. Atwood again is objecting; and this time he believes, based on the disposition of a fine only, that there should not be the awarding of a point for that conviction either.

THE COURT: All right. Now this one I actually -- hold on a second because we're skipping ahead.

(Brief pause in proceedings.)

THE COURT: Okay. Bear with me while I work my way through here.

(Brief pause in proceedings.)

THE COURT: All right. Pursuant to U.S. Sentencing Guidelines Section 4A1.2(c), I looked at that provision. It appears that that point is correctly added under the terms of that guideline section; so, therefore, that objection is overruled. The Court will adopt the probation officer's position. The government didn't take

a position on that.

All right. So we're actually into the objections that you filed, so let me go back and start from the beginning.

MR. WELCH: We just have one more correction.

THE COURT: All right.

MR. WELCH: In paragraph 43, it mentions a warrant for arrest was issued. That warrant is no longer active.

THE COURT: Do you have any knowledge about that, Mr. Freres?

MR. FRERES: I got a call yesterday from -- I believe it was Cook County, related to a DUI that Mr. Atwood is charged with. I do not have any knowledge of the Will County one. The Cook County case, which -- or maybe it was Will County; but whatever it was, the DUI, it is still active, and they are examining it, whichever one it is.

THE COURT: All right. This is the Will County one, so I will simply strike out the last phrase of that sentence. It's not going to affect anything anyway, but I'll just strike it out.

All right. So let's go through the other objections, one at a time. So I'm on page 24 of the -- this is addressing the second addendum. There is an

objection to page 5 and 7, paragraphs 8, 22, and 27, as to that version of the presentence report.

I understand the defendant's position.

Is that correctly stated, the objection, Mr. Welch?

MR. WELCH: Which --

THE COURT: On page 24.

MR. WELCH: Yes, Your Honor. That's correctly stated that --

THE COURT: There's not --

MR. WELCH: -- we're objecting.

THE COURT: Mr. Freres, it says the government's position is unknown. What's the government's position?

MR. FRERES: Judge, I took the position the other day in the motion to quash that we would concede all relevant conduct absent the buy that relates to this, which is 28.8 grams; so I have no problem amending those sections. Again, I think it's correctly applied. It's just unnecessary and irrelevant today; so, in the interest of judicial process, I have no problem conceding the objection.

THE COURT: I will -- just a second.

(Brief pause in proceedings.)

THE COURT: I will find the application of the

section is not necessary because it will not affect the applicable sentencing guideline range; and, further, I will not consider the issue when determining the appropriate sentence. So I'm striking "other" and saying "no impact on guideline range."

All right. Reference -- I'm on page 25. There's an objection to paragraph -- pages 6 and 7, paragraphs 14 and 25. Is this the evidence to which you were going to -- excuse me. Is this the objection to which you intended to present evidence?

MR. FRERES: Page 25, Your Honor, --

THE COURT: Yes.

MR. FRERES: -- and relating to the second objection, yeah. There's the -- I mean, some evidence of it, Your Honor, yes. The Court will see the interaction between Mr. Atwood and the other two codefendants.

THE COURT: Do you wish to present that now then?

MR. FRERES: Whenever.

THE COURT: Let's do it now.

MR. FRERES: Okay. The United States would call Special Agent Dave Gomez.

MR. WELCH: Your Honor, is it your practice, before we get any further into this, to identify Mr. Atwood's family members now or later, who are here in

support?

THE COURT: We can do it now. I presumed they were family members. I've seen them at other hearings before so I sort of knew who they were.

MR. WELCH: Okay.

THE COURT: Mr. Atwood, do you want to tell me who they are specifically or have them, call their names and they can stand up and I can -- I'm not sure if I've even -- I know I've seen them here several times before, so I recognized them. Why don't you --

DEFENDANT ATWOOD: Briana Brugman [phonetic], my friend; my sister, Jessica.

THE COURT: All right.

DEFENDANT ATWOOD: My brother, Jeremy.

THE COURT: All right.

DEFENDANT ATWOOD: My niece, Michelle; my Uncle Mark.

THE COURT: All right. I don't, I don't recall on which occasions I've seen some of those people, but I know I've seen some of them before. All right.

(Brief pause in proceedings.)

DAVID GOMEZ, sworn, 10:55 a.m.

MR. FRERES: Your Honor, may I approach the bench?

THE COURT: Sure.

MR. FRERES: I've given defense counsel a copy of this transcript that goes with the video.

THE COURT: Thank you.

MR. FRERES: With leave, Your Honor?

THE COURT: Please.

DIRECT EXAMINATION BY MR. FRERES:

Q Good morning.

A Good morning.

Q Would you please state your name and spell your last name for the record?

A David Gomez, G-o-m-e-z.

Q How are you employed?

A I'm employed as a special agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives.

Q How long have you been with ATF?

A Seventeen years.

Q Where are you currently stationed at?

A In the Kankakee, Illinois, area.

Q And which field office are you associated with?

A The Chicago Field Division.

Q What types of cases do you work on as you're in your capacity as an ATF special agent?

A The, the types of cases we investigate have to do with violent offenders relating to violations of federal firearms laws and narcotics laws.

Q Do you investigate gun trafficking?
A Yes.
Q Drug trafficking?
A Yes.
Q Street gangs?
A That is correct.
Q Things of that nature?
A Yes.
Q Now, I'm going to direct your attention to 2014 and 2015. Were you involved in an investigation of some street gangs in Kankakee at the time?
A Yes, I was.
Q Tell us about that, please.
A At that time, we were investigating the Kankakee faction of the Latin Kings street gang.
Q When, approximately, did that investigation run?
A Approximately 2014 and 2015.
Q Okay. And who were some of the, the individuals you investigated as part of that?
A The upper, high-ranking gang members, to include Mr. James Atwood.
Q Did you also -- and the individual you're suggesting is Mr. Atwood, can you identify him here just formally for the record?

A Yes, I can. He's sitting over here in the orange jumpsuit, tattoos, beard, and long hair.

THE COURT: The record can reflect the witness has identified the defendant, James Atwood.

BY MR. FRERES:

Q Did the investigation also involve an individual with street, the street name of G.K.?

A Yes. That is correct.

Q Who was that individual?

A G.K. is Jovan Saulsberry.

Q And do you know what G.K. stands for?

A Yes, I do.

Q What is it?

A G.K. stands for "Gentleman Killer."

Q The individual known as "Trigg" or "Little Trigg"?

A Yes.

Q And who is that?

A Jessie Dorsett, Jr.

Q And "Trigg" or "Little Trigg," what -- does that mean anything to you in reference to what that could be referring to?

A Yes, it does.

Q What's your understanding what that means?

A That -- "Little Trigger," that he was prone to

violent, violent acts using firearms.

Q Now, were Mr. Saulsberry and Mr. Dorsett actually the codefendants with Mr. Atwood in this case?

A Yes.

Q During the course of that investigation, did you develop a source who assisted in the investigation?

A Yes, we did.

Q And did that source have personal knowledge and, in fact, somewhat deep ties with these individuals that we just discussed?

A Yes.

Q I'm going to direct your attention to January 22nd of 2015. Did you use the confidential source on that day to make a controlled purchase of cocaine from these individuals?

A Yes, we did.

Q And tell us about the process, how that was set up.

A It was set up through some phone calls. We met as a team to come up with some plans in a briefing to, to make a purchase of approximately an ounce of cocaine.

We then gave the informant prerecorded government funds and recording equipment and then surveilled the process as the transaction transpired.

Q Did you use a video recording device as part of

the operation?
A Yes.
Q And did you personally set up that recording device inside the source's vehicle?
A Yes, I did.
Q And is the -- did you later also collect that recording device after the operation had ceased?
A Yes.
Q From the source's vehicle?
A That is correct.
Q Did you review the recording after that point?
A Yes.
Q And did the recording show you personally at the beginning setting up the recording device inside the source's car?
A Yes, it does.
Q And did it run continuously throughout?
A Yes.
Q Approximately how long did the video run?
A It was approximately about an hour long in length.
Q And at the end -- at the end of it, can you also be observed or seen -- excuse me, heard on the video collecting the recording device and meeting with the source?

A Yes.

Q And, of course, the end of this transaction was the ounce of cocaine that Mr. Atwood and his cohorts have all pled guilty to, correct?

A Correct.

Q You mentioned you reviewed the video. Did it run continuously throughout?

A Yes, it did.

Q Had it been tampered with in any way?

A No.

MR. FRERES: Your Honor, may I approach the witness?

THE COURT: Sure.

BY MR. FRERES:

Q I'm handing you what I've marked as Government Exhibit 1. Do you recognize that?

A Yes, I do.

Q Is that the recording from the controlled purchase on January 22nd of 2015?

A That is correct.

Q And is that a fair and accurate copy of what you downloaded or seized from the recording device on that day?

A Yes, it is.

MR. FRERES: Your Honor, I'd move to admit

Government Exhibit 1.

THE COURT: Any objection, Mr. Welch?

MR. WELCH: Not at this time.

MR. FRERES: Your Honor, may we play the recording?

THE COURT: Exhibit 1 is admitted. You may play it.

Do you also want to admit Exhibit 1-TR as a demonstrative exhibit?

MR. FRERES: Yes, please.

THE COURT: Any objection, Mr. Welch?

MR. WELCH: We would object to the video. Yes.

THE COURT: I'm asking about the transcript.

MR. WELCH: Oh, well, that's why I was saying there would be an objection at a later time. Our objection would just be that we're not able to cross-examine the other individual in the video, so --

THE COURT: All right. It's overruled. I'll take it -- of course, I'm aware you can't cross them, so I'll take that into account.

MR. WELCH: All right. Thank you, Your Honor.

MR. FRERES: May we publish, Your Honor?

THE COURT: You may publish.

MR. FRERES: And, Your Honor, from this point, may I be seated at counsel table because I have --

THE COURT: Yes.

MR. FRERES: -- my very able paralegal is in sunny Florida today, so I'm running this on my own.

THE COURT: All right. 1-TR is admitted, and we'll hope Mr. Freres's skills are up to the task.

(Brief pause in proceedings.)

BY MR. FRERES:

Q Now, Agent Gomez, the clips we're playing today is not the entire video, correct?

A That's correct.

Q The -- before we start the video here, does the video depict, for the majority, the two individuals sitting in a car?

A Correct.

Q Is the driver of the vehicle the confidential source?

A That is correct.

Q And who is the person in the passenger seat?

A Mr. James Atwood.

Q Okay. All right. We're going to play the recording now.

(Publication begins, 11:02 a.m.)

THE COURT: Mr. Freres, could you stop there and go back a little bit.

MR. FRERES: Yes.

We've paused the -- I don't have a --

THE COURT: Go back, if you can go back -- can you go back?

MR. FRERES: Oh, my gosh. I know Staci could. I can try here.

THE COURT: I did not mean to ask you to do something beyond your skill level. I apologize.

(Brief pause in proceedings.)

THE COURT: Never underestimate the importance of a good paralegal.

MR. FRERES: And Staci is a good one.

(Brief pause in proceedings.)

MR. FRERES: I'll start there.

THE COURT: I promise I will not ask you to go back again. If you have to start from the beginning, that's fine.

MR. FRERES: I may have to, Your Honor. I apologize. I'm not -- there's not a bar to --

(Brief pause in proceedings.)

MR. FRERES: Yeah. Your Honor, I apologize. Can I just start it from the beginning?

THE COURT: Yes.

(Publication begins, 11:05 a.m.)

MR. FRERES: I'm going to pause it right here.

Your Honor, I don't know what the Court's

question related to.

BY MR. FRERES:

Q Agent Gomez, did you hear the source say, "I got another 15 for a whole," and it says "(unintelligible)"?

A Yes.

Q Do you know what the "15" is referring to?

A $1500 that he's got in the government funds in order to purchase the ounce of cocaine.

Q This is what they're discussing at this point, is the cocaine purchase?

A That's correct.

MR. FRERES: Your Honor, did the Court have a question?

THE COURT: That's what I was focused on. Go ahead. You've answered my question.

MR. FRERES: Thank you.

(Publication continues, 11:06 a.m.)

MR. FRERES: I'll pause it right here.

BY MR. FRERES:

Q Agent Gomez, did you -- at any time, did you see a reference to a "dusty dusty," what Mr. Atwood said?

A Correct.

Q What was he referring to there?

A Just making money.

Q Did the source actually hand him the money at that point?

A That's correct.

Q And did Mr. Atwood keep some of that money related to a previous incident?

A Yes.

Q Was that a, money that was paid for a different operation?

A That is correct.

Q And did he give the money back to the source and direct him to G.K. to complete the transaction?

A That is correct.

MR. FRERES: Your Honor, may I continue?

THE COURT: Yes.

(Publication continues, 11:08 a.m.)

BY MR. FRERES:

Q Agent Gomez, at the end of that here, did you hear Mr. Atwood say to go pick it up from Trigg?

A Yes.

Q And did this operation, this recording, actually capture the source picking up cocaine from Jessie Dorsett?

A That's correct.

THE COURT: Jessie Dorsett is Trigg?

WITNESS GOMEZ: Correct.

BY MR. FRERES:
Q Now, the video continues at this point, but we're going to skip at this point, so I'm going to move forward here to another portion.
(Brief pause in proceedings.)
Q Agent Gomez, did the video recording also discuss a shooting that occurred in Kankakee?
A Yes, it did.
MR. FRERES: Your Honor, I'd ask to play this portion of the video.
THE COURT: Sure.
(Publication continues, 11:11 a.m.)
BY MR. FRERES:
Q Agent Gomez, do you know -- did you hear a reference to "Dookie"?
A Yes.
Q Do you know who Dookie is?
A It's actually "Duty."
Q Duty.
A Duty. It's David Saulsberry; it would be Jovan Saulsberry's brother.
MR. FRERES: Your Honor, may I keep playing?
THE COURT: Please.
(Publication continues, 11:14 a.m.)

BY MR. FRERES:

Q Agent Gomez, did you hear a reference to "black tar" and "regular"?

A Correct. Yes, I did.

Q In your training and experience, do you have any familiarity with what that may be referring to?

A Yes, I do.

Q What is that?

A Heroin.

MR. FRERES: May I keep playing?

THE COURT: Please.

(Publication continues, 11:15 a.m.)

BY MR. FRERES:

Q Agent Gomez, does the, does the reference to "brown" mean heroin here as well?

A Yes, it does.

Q And did you hear the word "bricks"?

A Yes.

Q What, if any, meaning does that have to you?

A "Bricks" is usually terminology for a kilogram of cocaine or heroin.

MR. FRERES: Your Honor, may I keep playing?

THE COURT: Yes.

(Publication continues, 11:17 a.m.)

BY MR. FRERES:

Q Okay. And does the video continue on at this point --

A Yes.

Q -- as well?

MR. FRERES: Your Honor, I'll skip forward to the last section here, if that's okay.

THE COURT: Sure.

(Brief pause in proceedings.)

(Publication continues, 11:18 a.m.)

BY MR. FRERES:

Q All right. Agent Gomez, here in this last little portion, what, what's your understanding of what they're talking about?

A He's dropping -- he's getting out of the vehicle; and, and Mr. Atwood is directing the informant to go and pay and pick up what he ordered up, an ounce of cocaine from Trigger; or if it happens to be G.K., give the money to him.

MR. FRERES: Your Honor, I have no further questions for Agent Gomez.

THE COURT: Agent Welch, do you have -- Agent Welch -- Mr. Welch, do you have questions for Agent Gomez?

MR. WELCH: Yes.

CROSS-EXAMINATION BY MR. WELCH:

Q You say you first became involved with this investigation regarding the Kankakee Latin Kings in 2014?

A Yeah, approximately 2014.

Q And is that when you started investigating any incident specifically involving Mr. Atwood?

A No, because our intelligence that we had concerning the Latin Kings -- everything we were learning about the Kings at the time, Mr. Atwood was involved in, in the leadership.

Q In 2014?

A Correct.

Q And was your CI similarly involved in leadership?

A At that time, no.

Q In relation, again, to Mr. Atwood, when, when did you begin to engage the use of the CI?

A I'm not sure. I don't -- I'm not sure if I understand that question.

Q I was asking what time frame, as to when the CI became involved with activity regarding Mr. Atwood?

A At the inception of the investigation.

Q And, and you've already testified, I believe, he was the CI at the time that these recordings were made?

A That's correct.

Q You made ref-- excuse me. You responded to a question from Mr. Freres regarding moneys owed for a prior transaction?

A Correct.

Q And you said that was not involved in, in these cocaine sales?

A No. I didn't say that.

Q Oh. Was that a prior transaction related to marijuana and not cocaine?

A No. It was related to cocaine.

(Brief pause in proceedings.)

Q I believe that's --

(Brief pause in proceedings.)

Q Were you aware of any allegations of a robbery by the CI of Mr. Atwood?

MR. FRERES: Objection, irrelevant.

THE COURT: Mr. Welch, what's the relevance of that?

MR. WELCH: Just --

THE COURT: We're talking about this CI we saw on the screen?

MR. WELCH: Yes, the CI on the screen.

THE COURT: I'll overrule the objection.

Go ahead and ask -- answer the question.

WITNESS GOMEZ: No.

MR. WELCH: That, that would be all.

THE COURT: Redirect?

MR. FRERES: No, Your Honor.

THE COURT: You may step down.

(Witness Gomez excused, 11:24 a.m.)

THE COURT: All right. As far as the objection, pages 6 and 7, the objection to paragraphs 14 and 25 -- it's on, on page 25 of the fifth revised presentence report -- pursuant to Section 3B1.1(c), and reviewing both paragraph 7 through 14 of the presentence report, as well as having just watched and listened to Government's Exhibit 1, I have no hesitation finding the defendant exercised decision-making authority. He is clearly -- when you consider those paragraphs, he's doing so. Even listening to the defendant's own words during this Government's Exhibit 1, he is directing others where to go, what to do regarding transactions for drugs, the exchange of money, where to pick them up, where to drop them off.

It appears from the information in both the paragraphs and Government's Exhibit 1 he's also directing the dispersion of drug proceeds. From the paragraphs involved, he's taking a larger portion of the proceeds, how much to pay others in there. He also clearly, on the

video, is taking the money and making decisions as to where other portions of the money goes. He hands it to the CI, in fact, on the video.

So I find that I'm adopting the position of the government and the probation officer. That objection is overruled. That enhancement of two levels under 3B1.1 certainly applies.

All right. Next, we move on to the objection on page 8, paragraphs 32 and 33. These regard two juvenile adjudications. The defendant received no points for that. What's the government's position?

MR. FRERES: I don't know that there's a position to take, Your Honor. It has no bearing on anything; and, certainly, I'm not going to rely on a couple of juvenile convictions in any part of my argument.

THE COURT: All right. I find that the determination of this objection is not necessary because the matter -- the objection will not affect the applicable sentencing guideline advisory range; and, further, I'm not going to consider those two juvenile convictions when I determine the appropriate sentence. So whether or not they happened, they are not something I'm going to take into account.

So I will indicate "other," and it will have no

bearing upon either the sentencing guidelines or the Court's sentence.

(Brief pause in proceedings.)

THE COURT: All right. The next objection is to paragraphs 28, 46, 47, and 48 on pages 7 and 12. That's the objection that's encapsulated on 26.

Mr. Welch, as I understand the objection, it's because the prior convictions that are referenced in those paragraphs -- just a second.

(Brief pause in proceedings.)

THE COURT: All right. The defendant has a conviction for delivery of a controlled substance in two separate cases out of Kankakee County, 04-CF-401 and 10-CF-458; and the defendant's objection is that he should not be considered a career offender because those two offenses are similar to the present offense. You filed a memorandum about that as well, which I read. Is it, is it, in essence, that he's being repeatedly punished for the same conduct? Do you wish to expand on that objection, or have I stated it correctly? Or your theory behind the objection?

MR. WELCH: Your Honor, I believe you have stated it correctly, but we would expand on that. We believe that the case law that is, from the Seventh Circuit, that has come about in this particular area

involves more than just a mere counting of convictions, and they -- the Seventh Circuit has given some guidance as to what would constitute a "similar offense."

Here, Your Honor, we believe that the same actors are basically present. Latin Kings. Cocaine. We believe that the Kankakee KAMEG was involved. It involved controlled buys and in the same basic locations; and that is the purpose of Defendant's Exhibit Number 1, to show that, in particular for the two prior convictions, they occurred in the same block of Bradley, Illinois, that being the 100 block of North Washington.

The present offense occurs in the Kankakee area, and Bradley is an adjoining city to Kankakee, so we believe that this fits into the same basic geographic location that the cases -- essentially, the Liddell case, or Liddell [different pronunciation] case make reference to the one that's cited in the sentencing memorandum.

The -- and, again, this is not a case where then you would have the three convictions: one involving, let's say, firearms; one involving the sale of some other item; and then the present case involving cocaine. All three of these cases involve the selling of cocaine and approximately, Your Honor, the same type of quantities, the same method of operation, or MO. And in point of fact, I believe Mr. Atwood was still under the

parole sentencing requirements at the time of this offense so that, Your Honor, this, we argue, is part of a continuous activity on the part of Mr. Atwood on behalf of the Latin Kings, or with or in conjunction with the Latin Kings, involving the same substances, the same basic area and location, the same actors, and the same method of operation. On that basis, Your Honor, we believe that Mr. Atwood should not be considered a career offender.

Thank you.

THE COURT: All right. And it's -- I don't know how to pronounce it either, but it's United States v. L-i-d-d-e-l-l. It's a Seventh Circuit case, 492 F.3d 920 (Seventh Circuit 2007), which I've read, as well as some other cases cited within that case.

Mr. Freres, what's the government's position?

MR. FRERES: Your Honor, the career offender provision -- I know the Court sees this; we see it all the time -- it's governed in Section 4B1.1 of the United States Sentencing Guidelines. And when it comes to how things are counted, that's actually 4B1.2. We have to be careful, of course -- again, the Court knows this -- there's a difference between the career offender provision and the armed career criminal provision. I heard Mr. Welch talk about three convictions. That's the

armed career criminal provision. To be a career offender, you only need any two, a combination of two controlled substance offenses or crimes of violence.

Mr. Atwood has two controlled substance offenses, which is defined in 4B1.2(b) as an offense under federal or state law punishable by a term of imprisonment exceeding one year. That prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance or the possession of a controlled substance with the intent to do any of those things. So convictions for delivery of a controlled substance under Illinois law routinely apply under that. He has two of them.

Then you turn to 4B1.2(c) to determine how you count two prior felony convictions, and it essentially boils down to: Do they count separately for criminal history points? And these both do.

So I think it's -- the Probation Office, as they always do, did a good job calculating this; and they're correct in this instance as well.

THE COURT: All right. Well, the -- I find that the decision in Liddell is not applicable to this case. The issue really comes down to the third component of 4B1.1 of the career offender section. It clearly meets the first two components of 4B1.1 of the career

offender section. That goes without saying, and it's not being -- those two parts are not being disputed.

The third portion of the career offender section is what's at issue in this objection. Whether or not these are prior convictions is really a, probably, more succinct way of stating the objection; whether or not these all merge into one because, if they are separate offenses, then he's a career offender.

Another way to say it would be if this criminal offense is part of a common scheme or plan -- all the convictions are all one, one ongoing common scheme or plan -- then I think you would find more support in Liddell.

Here, they're separate. They're separate locations, separate transactions. Separate actions are involved.

If -- I guess in the alternative, or a different way I could say it, would be: If Liddell and some of the cases cited in Liddell were interpreted as broadly as the defendant requests, it would mean that if someone was part of a gang and they operated in several counties and they continually sold controlled substances, or were involved in continuous crimes of violence, as long as the same gang and its members were involved and as long as it fit in some broad classification of drug

sales or, say, bank robberies, even if all those bank robberies or all those drug sales were separate, to accept the defendant's position would be that those defendants could all find safe harbor by saying: We're not career offenders because we're all part of the same gang; and even though we've been in and out of prison, it's all continuous, and we all keep doing the same offenses. So this all merges as a one -- it all merges as a common scheme or plan; these are all inseparate.

That -- it doesn't make any sense. It doesn't make any sense to me. I don't think it would make any sense to anybody on the Seventh Circuit. So the objection is overruled. I do find the defendant is a career offender because he meets all the requirements of, under 4B1.1. So the Court adopts the probation officer's and the government's position as to that. That objection is overruled.

Next we have, page 11 -- page 11, paragraph 40, I've already made a ruling on that at the beginning of the set of objections.

Mr. Welch, my reading of paragraph -- the final objection on page 29 -- it's reference to page 4, paragraph 2. That's the same objection. I didn't see anything different with that. Unless I'm wrong, it's about the 851 notice being filed, but the 851 notice was

filed -- I didn't understand. Is that disputed or what, what's -- what's the issue? I don't -- I didn't really understand the issue. I mean, I took the change of plea. My -- I don't have a didactic memory, so I don't remember every single thing that happened; but I did look at the docket, and the docket indicates that there were not one but two pleadings filed at the same time as the -- give me a second.

(Brief pause in proceedings.)

THE COURT: So my recollection was there was reference to those being filed. They were filed at the same time, consistent with the change of plea on the same day.

Mr. Freres, do you want to address this at all?

MR. FRERES: Yes, Your Honor. I actually listened to the recordings yesterday so I can tell the Court what happened.

THE COURT: Listened to the recordings of what?

MR. FRERES: The, the proceedings, the --

THE COURT: The change of plea hearing on July 14th?

MR. FRERES: Actually, we showed up that day for a pretrial conference with a trial date a week out. And after we went through part of the pretrial conference, Mr. Atwood indicated that he had not seen the

video but wanted to make a plea. The Court adjourned at this point. We weren't expecting a change of plea that day. The Court adjourned at that point to let him go see the video. He went to see it with Mr. Welch. He came back up and indicated he wanted to plea.

Now, we have to file an 851 notice in advance of a plea; so we did it at that time because that was the amount of time we had, that afternoon, with notice that a plea was going to happen.

We made a record of filing the 851. It's very clear. We advised him of the higher penalties. I indicated that it had been filed throughout, and Mr. Atwood acknowledged that he understood that.

And, quite frankly, when you're -- the whole purpose of 851 is to make an objection to the existence of the convictions. He hasn't done that. So, you know, any objection to it being -- him claiming that he would have objected or something would basically be frivolous at this point. He's not challenging the fact that that conviction exists or he's the person named in it.

THE COURT: Mr. Welch, as I look at the docket, that is consistent with what Mr. Freres just said.

If you look at the first docket entry, it -- for 7/14/2017, it indicates that we were set to go to trial. We were having a pretrial conference. It changed

to a status conference. The status of the case was discussed. We went into recess and then reconvened for a change of plea. Change of plea was not completed, and I indicated we would convene "later today for a change of plea hearing if that was necessary." We were going to commence the change of plea at 4:45 p.m., so late in the day.

And if you look at when the informations are filed, they are filed at about that same time. I know when you file things electronically, especially through the courthouse, it's going to show up a few minutes later. But I see one of the notices was filed at 4:57 and one filed at 4:59. So that's all consistent with what Mr. Freres just said, that there -- Mr. Atwood was advised -- oh, and I did the change of plea. So I, I am certain I would have asked whether or not there were prior convictions; and all this seems consistent with both the docket, the time stamp, and when I look at -- when we actually started the hearing, it was actually very close to 5:00 so that would actually be after when those were filed.

So do you have any dispute as to the fact that Mr. Atwood knew when he was pleading guilty that those prior convictions were filed or that I didn't advise him or -- clarify for me what your objection is, based on,

based on what's in the docket and the record and the time stamps.

MR. WELCH: Our objection was that my recollection is that we had started the hearing in the afternoon and that the government asked for a brief -- I don't want to say continuance, but a recess of the proceedings and then filed. So our objection is that we had commenced the plea hearing prior to the filing -- we, and we did not make any objection as we started; we did not want to alert them to that fact -- and that Mr. Freres realized what had happened. But our objection is that the hearing had already started; and, therefore, Mr. Atwood should not be held responsible under the 851 proceeding.

THE COURT: All right.

MR. FRERES: May I make just one final note, Your Honor?

Just the 851 notice actually has no bearing on whether he's a career offender. It only impacts the guideline range is all. So, I mean, this is sort of --

THE COURT: I mean, that's true. It does, it does -- yeah, through the career offender section; because the statutory maximum, it would affect the guideline range in that instance.

But in either event, let me say this: Look,

I'm just a straight, normal district judge. I don't -- as an opinion recently authored by Judge Hamilton, I don't have the luxury of engaging in extensive research, especially into other circuits, looking for minutia. So I'm using just plain common sense.

In this circumstance, we start off with the final pretrial because I believed at that time, short of anything else, we were going to trial. It's understandable the government didn't have 851 notices on hand because they think they're going to go to trial; and they'll probably file it before trial commences, before jury selection starts.

Suddenly, the defendant changes his mind but says, "You know, I am going to plead," but he wants to look at some evidence first, so he looks at some evidence. Then we start the hearing; and then we -- when it appears that he is going to change his plea, the government files the notice.

While I'd started the hearing, if we're going to get hypertechnical, the plea is not accepted until the end of a change of plea hearing. Maybe I'm wrong. Maybe the Seventh Circuit will say, "No, unless" -- I have to -- when I say some magic word to commence the hearing -- you know, say, for example, "So we're going to do a change of plea hearing" -- maybe that starts the

clock. Maybe that's the deadline for when the government has to have filed it. But from a common sense point of view, it's not a race to the courthouse door. In this case, it's not a race to see who can hit the button on their computer first.

I would say until I get to the very end, the plea hasn't been accepted. And by that point in time, the information was, about the prior conviction -- the 851 was filed.

You know, as a matter of fact, again, I'm -- look, I'm just giving you my common sense analysis right now, so maybe the Seventh Circuit is going to pull out some case I haven't heard of saying, "You can't do that."

But the flip side of that, of course, for Mr. Atwood's benefit, is he could always have said -- once he found out the government had filed their, their prior conviction he could say, "Oh, my, my plan has been outmaneuvered. I don't wish to plead guilty. I wish a trial," and I would have said "fine," because the hearing would have stopped. I hadn't completed the change of plea colloquy. He hadn't fully pled guilty. I have to say at the end, "I accept the plea." So there's a flip side to that also. Once the government filed that notice, Mr. Atwood could have said, "Okay. Well, now I'm not going to plead." Clearly, he had notice. Clearly,

he did it. "Did it" in terms of went ahead and pled guilty.

Based on the circumstances of this, starting, stopping -- I actually even said that incorrectly. Acting as though we're proceeding to trial, stopping, having the defendant look at some evidence, restarting, stopping again when it's clear the defendant is going to plead guilty, notice is filed, starting a second time to finish off the change of plea -- I think unless someone is going to go extremely hypertechnical, they could not say that the defendant was not on notice that there was going to be a prior conviction which was going to result in a sentencing enhancement under Section 851. So -- yeah. So that over-- that objection is overruled.

Mr. Welch, if you want to appeal that, I'd be interested to see if the Court of Appeals tells me that I'm wrong because I'm just a -- I'm just a lowly district judge in a courthouse here, basically all by myself, trying to do the best I can and trying to apply common sense. I don't have the luxury of being able to stop and do extensive research. I knew about this objection before. I didn't know that Mr. Freres had listened to the audio of it. But when I read this the first time a few days ago, I went through it again. I was going to make that ruling. I try to do some research. I couldn't

find any cases on point, but I couldn't spend days and days trying to find something. So that's my common sense assessment.

The -- so at this time, then, that objection is overruled. The Court adopts the probation officer's position and the government's position.

The last objection is on page 10, paragraph 37. It's reference to page 31 of the presentence report. For that one, I've already adopted the defendant's position.

Mr. Welch, I think that's all of the objections mentioned in both your memorandum and to the Probation Office as to all the various versions, the various iterations of the presentence report; is that, is that correct?

MR. WELCH: Yes, Your Honor. That is correct.

THE COURT: All right. Mr. Atwood, you get a say here now. Let me ask you first: Have you -- just -- I have to just ask you these questions for the record. You read and reviewed all the different versions of the presentence report, correct?

DEFENDANT ATWOOD: Yes, Your Honor.

THE COURT: And I know you have because you told me in letters, et cetera. But you had a chance to discuss all the different versions and the objections with your attorney, correct?

DEFENDANT ATWOOD: Yes. I just got the revised PSI yesterday. Yes.

THE COURT: Right. But I saw you talking to Mr. Welch in here. We even started later so -- all right.

So the big question here for me now is: Do you, do you have any other objections that Mr. Welch, for whatever reason, won't raise on your behalf that you want me to take up?

DEFENDANT ATWOOD: I mean, with the 851, when we came in and --

THE COURT: No, no, no. We're not going to go back over it. I already ruled on that.

Do you have any separate other objections?

DEFENDANT ATWOOD: Um --

THE COURT: I know you probably don't like my ruling on that. I understand. So I'm not going to -- the record is what it is. We can prepare a transcript of the change of plea hearing. The time stamps on the documents can be examined by the Court of Appeals. You know, if I'm in error and there's a case out there I couldn't find when I looked for it on Sunday, they'll tell me that I'm wrong. But, so I don't want to talk about any -- we're not going to reargue anything I've ruled on.

Do you have any other separate objections? Or have we now covered the waterfront on your --

(Brief pause in proceedings.)

THE COURT: Take your time, Mr. Atwood.

Let the record show: Mr. Atwood is looking at notes and talking to his attorney.

(Brief pause in proceedings.)

THE COURT: Defendant's Exhibit 1 is admitted, if I didn't already say so.

(Brief pause in proceedings.)

THE COURT: Mr. Welch.

MR. WELCH: Your Honor, Mr. Atwood would raise an additional objection to the quashing of the subpoenas that we were trying to issue for the two named parties. He wants that on the record that he --

THE COURT: That's fine. I mean, I ruled on that; and, frankly, the government conceded, so that would serve no purpose except to --

MR. WELCH: Right.

THE COURT: -- waste the Court's time.

MR. WELCH: We wanted to make sure that that was clear, --

THE COURT: Okay.

MR. WELCH: -- since it wasn't --

THE COURT: That's fine.

MR. WELCH: -- in our listed objections --

THE COURT: That's fine.

MR. WELCH: -- that he's objecting.

THE COURT: That's fine.

MR. WELCH: And that relates, also, then, to the video.

THE COURT: He wished to call that CI?

MR. WELCH: Yeah.

THE COURT: Well, we saw the transaction on the video.

MR. WELCH: He wanted to -- he wanted to get into other matters, Your Honor.

THE COURT: All right. Well, you know, the government conceded the issue as to the weight for the other matters, so that's --

MR. WELCH: There were other things that he wanted to raise regarding the CI.

THE COURT: I'll put it this way: There are always lots of people that can be subpoenaed. If what they're going to offer isn't relevant to the Court's decisions, especially if the government concedes, then it becomes unnecessary to call those witnesses to support objections.

I watched the recording. I could find the CS was, frankly, lying about everything. I heard what the

defendant said from his own mouth. I could see it on the video. So the CI could have 27 perjury convictions and be entirely not credible on the witness stand, and it's irrelevant if I'm watching the defendant talk to someone, the CI, and I hear what the defendant is saying and watch his lips move when he's saying it. So it would have served no purpose to call that CI. So -- all right. That objection is on the record. All right.

Is there anything else? Or was that, was that it?

MR. WELCH: I think that's it.

THE COURT: Mr. Atwood, that's it?

DEFENDANT ATWOOD: Yes, Your Honor.

THE COURT: Okay. All right. So at this time, then, I'm adopting the presentence report with the, with my rulings on the various objections noted in the Court's copy of the presentence report, which will be filed at the conclusion of this hearing.

At this time, then, I adopt the fifth revised presentence report and all of its paragraphs and findings contained therein as adjusted for the rulings on the Court's objections -- or rulings on counsel's objections. This results in an applicable offense level of 31. Defendant's criminal history is VI as a career offender. The resulting sentencing guideline range as to Counts 1

and 2 is 188 to 2-- oh, actually it's 188 months. Is that right? Wait a second.

(Brief pause in proceedings.)

THE COURT: Yeah, 188 to 235 months as to Count 3. I'm checking to make sure there's not an error.

(Brief pause in proceedings.)

THE COURT: Yeah. It's a -- yeah, 188 to 235 months is the applicable guideline range.

Counts 1 and 2 have supervised release of -- why am I confusing myself?

Well, for Counts 1 and 2, it's going to be -- supervised release is going to be six years; for Count 3, one to three years.

Defendant's not eligible for probation.

There's a fine range of 30,000 to $4,250,000. Restitution's not applicable; and there is a $100 special assessment on each of the three counts, for a total of $300.

Is that the correct guideline range, Mr. Freres?

MR. FRERES: Yes, Your Honor.

THE COURT: Mr. Welch, do you agree?

MR. WELCH: Yes.

THE COURT: Statutorily, for Counts 1 and 2, the defendant faces up to 30 years' imprisonment; for

Count 3, up to eight years' imprisonment.

Supervised release on Counts 1 and 2 is a mandatory minimum six years; for Count 3, up to one year.

He's not eligible for probation.

On Counts 1 and 2, he faces a fine of up to $2 million on each of those two counts for a total of 4 million; plus on Count 3 a fine of up to $250,000.

So I guess, Mr. Atwood, if you win the lottery, you could be fined up to $4,250,000. I don't think anybody in this courtroom has that money on hand, but that's the statutory fine range the Court finds.

Restitution's not applicable.

There's a $100 special assessment for each of the three counts, for a total of $300.

That's the statutory provisions correctly stated?

MR. FRERES: Yes, Your Honor.

THE COURT: Mr. Welch, do you agree?

MR. WELCH: Yes, Your Honor.

THE COURT: All right. Then at this time, I'll take the recommendation of the government.

MR. FRERES: Your Honor, if I may, I do have one more aggravation witness that will probably be --

THE COURT: Oh, beg your pardon.

MR. FRERES: -- under five minutes.

THE COURT: Go ahead.
MR. FRERES: Your Honor, the government would call Pete Nicholos.
PETER NICHOLOS, sworn, 12:00 p.m.
MR. FRERES: May it please the Court?
THE COURT: Please.
DIRECT EXAMINATION BY MR. FRERES:
Q Good morning.
A Good morning.
Q Would you please state your name and spell your last name for the record?
A Peter Nicholos, N-i-c-h-o-l-o-s.
Q How are you employed?
A I'm a detective sergeant with the Kankakee City Police Department, and I'm currently assigned as a task force officer with ATF.
Q How long have you been both with KPD and with ATF?
A I've been a detective sergeant since 2000, employed with the Kankakee Police Department since '92, and a task force officer with ATF since -- well, it's about eight years now.
Q During your time with ATF, do you work frequently with Agent Gomez in Kankakee County?
A Yes, I do.

Q And what kind of cases do you work on?
A Firearms, drug trafficking, and such -- federal cases mostly.
Q Were you involved in the investigation into Mr. Atwood?
A Yes.
Q And did -- are you aware of the video recording that was made on January 22nd of 2015 involving Mr. Atwood?
A Yes, I am.
Q Have you reviewed that recording?
A Yes.
Q And after reviewing that recording, did you hear Mr. Atwood discuss, what appeared to be discussing a shooting of a van in a house?
A Yes.
Q After that, did that prompt you to do any follow-up work?
A Yes, it did.
Q What, if anything, did you do?
A I contacted the Kankakee City Police investigators. We went through the report system to see if there was any such incidents reported to the police department.
Q And how far back did you check?

A We went back approximately six months.
Q So six months back from January 22nd of 2015?
A Yes, --
Q In Kankakee --
A -- through the prior year.
Q In Kankakee County, or in Kankakee City, --
A Yes.
Q -- were there any instances of shootings hitting both a van and a house during that time period?
A There was one. Yes.
Q When was that?
A It was January fif-- 14th, I believe, eight days prior to this.
Q Eight days prior to the date the recording was made?
A Yes.
Q Now, did you -- you mentioned that you spoke to the other detectives involved. Did the crime -- Kankakee crime scene respond to that incident?
A Yes. I believe it was Detective Sergeant Rich Sims that handled the crime scene.
Q And were photographs taken of the crime scene?
A Yes.
MR. FRERES: Your Honor, may I approach?
THE COURT: Yes.

MR. FRERES: I'm handing you what's been marked as Government Exhibits 2 through 17, and I've provided a copy for defense counsel already.

BY MR. FRERES:

Q Officer Nicholos, were those the photographs that were taken of the shooting you just referenced on January 14th of 2015?

A Let me check a few more.

(Brief pause in proceedings.)

A Yes.

MR. FRERES: Your Honor, I'd move to admit.

THE COURT: Any objection, Mr. Welch?

MR. WELCH: [No response.]

THE COURT: Any objection?

MR. WELCH: No.

THE COURT: The exhibits are admitted.

MR. FRERES: Your Honor, I'll just give them to the Court. I don't necessarily need to publish them to the Court. If the Court's admitting them, I'm just happy to let the Court review them.

THE COURT: Sure.

BY MR. FRERES:

Q Now, are you aware of who the victim of the shooting was on January 14th?

A Yes.

Q Is that individual associated with any street gang in Kankakee?

A Yes.

Q What gang is that?

A The Harrison Gents.

Q Did the Harrison Gents, based on your training and experience and knowledge of Kankakee County law enforcement, do they have a rival gang in Kankakee -- or did they at that time?

A Yes, they do.

Q And who is that?

A The Latin Kings.

MR. FRERES: No further questions, Your Honor.

THE COURT: Mr. Welch, any cross-examination?

(Brief pause in proceedings.)

CROSS-EXAMINATION BY MR. WELCH:

Q The individual you've identified as the victim, did you have any connection with him to Mr. Atwood?

A No.

Q And would it be fair to say that during this time period involved, the six months prior to the recording date, --

A Correct.

Q -- that there was a great deal of shootings going on in the Kankakee area?

A Reported shootings, I think there was 14 or 15 is what we came up with.
Q And that's ones reported?
A Correct.
Q There are obviously some not --
A Right. There are shots fired that, right, no one calls in; there's no victim or nothing's hit or anything. Correct.
Q Were there any other shootings involving that particular residence or that vehicle?
A No. That residence had called before a month prior to the shots fired incident. Yes. But nothing was hit at that time.
MR. WELCH: No further questions.
THE COURT: Agent Nicholos, just so the record's clear here, Exhibits -- Government Exhibits 2 through 5 are spent shell casings found on the street?
WITNESS NICHOLOS: Correct. Yes, Your Honor.
THE COURT: And Government Exhibits 6 through 13 are various bullet holes in, what appears to be a Honda Odyssey van?
WITNESS NICHOLOS: Yes. The -- Your Honor, the minivan was parked in the driveway of 1890, and the residence that was struck was actually next door.
THE COURT: All right. And Government's

Exhibits 14 through 17 are pictures of bullet holes in the siding of the house?

WITNESS NICHOLOS: Correct.

THE COURT: All right. Any further questions?

MR. FRERES: No, Your Honor.

THE COURT: Mr. Welch, any further questions? Any further questions of this witness?

(Brief pause in proceedings; defense counsel is conferring with the defendant.)

MR. WELCH: Your Honor?

THE COURT: Yes.

MR. WELCH: Can I have leave to ask a few more questions?

THE COURT: Sure. Absolutely.

MR. WELCH: Thank you.

FURTHER CROSS-EXAMINATION BY MR. WELCH:

Q Did you interview anyone in connection with these shots fired at this residence?

A Not at the time, no. Within the last few months, yes.

Q Is that Whitney Koch?

A Yes.

Q Did Ms. Koch identify anyone being involved in the shooting?

A Yes.

Q Did she identify Mr. Atwood being involved in the shooting?

A No.

MR. WELCH: That's all I have, Your Honor.

MR. FRERES: [Shaking head from side to side.]

THE COURT: You may step down.

WITNESS NICHOLOS: All right.

(Witness Nicholos excused, 12:07 p.m.)

THE COURT: All right, then, at this time I'll take the recommendation from the government.

MR. FRERES: Thank you, Your Honor. May it please the Court.

THE COURT: Please.

MR. FRERES: Mr. Welch.

Judge, the government's recommendation for the three counts is, for Counts 1 and 2, is the upper end of the range, 235 months, no fine, six years of supervised release, and the $100 special assessment. And then for Count 3, the -- I think I did the math correctly -- 96 months with one year of supervised release, no fine, and the $100 special assessment.

I, I don't make a recommendation at the upper end of a range lightly. I do think it's appropriate here.

THE COURT: You just lost me. Ninety -- you

didn't ask for consecutive. You just said --

MR. FRERES: Concurrent, Your Honor, for all three counts.

THE COURT: All right.

MR. FRERES: Counts 1 and 2, obviously, drive the sentence.

THE COURT: Right.

MR. FRERES: I don't ask for the upper end of the range lightly, Your Honor, of course, but I think it's warranted here.

When you walk through the sentencing factors, you start, of course, under Section 3553 with the nature and circumstances of the offense. Mr. Atwood's trafficking cocaine. Of course, this is not a large amount of cocaine, but he's doing it with others. He was the leader of this group, and the group was involved in violence. And I think it's pretty clear from the video that the Court saw that what was captured and what he's being held accountable for is just a small snapshot in time of what was really going on here.

When you look at the history and characteristics of Mr. Atwood, he has a long history of drug trafficking convictions. He's taken the position that this is all continuous conduct, which, again, to me suggests he hasn't learned from any of his prior

convictions, which is further, to me at least, recognition of what the, Congress and the Sentencing Commission have stated in the policy provisions regarding career offender sentencing, which I'll get to in just a second.

He's got two prior drug trafficking convictions, which landed him as a career offender.

He claims he's not got a history of violence; but his mob action conviction, in order to be the classification it was, requires the use of violence. And, of course, the Court can read from the PSR that it involved a shooting incident, a group shooting incident, essentially groups shooting at each other, which is, of course, what's going on here as well.

And no state sentence up to this point has had any effect on Mr. Atwood. He's had a range of sentences up to six years, and nothing has deterred the conduct. He's got another prior conviction for possession of a firearm and another one for using a firearm; and, again, here he's referencing a shooting as well and in this case as well. So, certainly, the history and characteristics are alarming.

And then we turn to the need for the sentence imposed. Of course, that -- the guidelines are to reflect the seriousness of the offense, promote respect

for the law -- all of that -- to afford adequate deterrence, to protect the public. I think there's a great need for all that here.

Mr. Atwood was the leader of this local faction of Latin Kings, or a leader, and they were involved in drug trafficking and violence and intimidation and ran rampant in Kankakee for quite some time.

All of that weighs in favor of a lengthy sentence, which takes us to the policy provisions of 3553(a), and that's where we get into the career offender provision and how this applies.

Of course the Court knows this, but the background notes to Section 4B1.1 suggest that career offenders should be sentenced at or near the maximum. Mr. Atwood, he's a career offender. His appropriate comps are not his codefendants. It's other career offenders. And the Court knows this, and that's specifically outlined in the policy provisions. You know, the career offender provisions outline that they were modified to focus on recidivist offenders for whom a lengthy term of imprisonment is appropriate.

And then, finally, the other policy section that's particularly relevant here is 5K2.6, which suggests that discharge of a firearm might warrant a substantial sentence increase. Of course, the Court

heard Mr. Atwood describing a very alarming incident that apparently took place one incident -- or one week before. We're not asking for an upward departure here, though I do think it warrants a sentence within the guideline range. I don't think there's any basis to depart from that range.

Does the Court have any questions for me?

THE COURT: Talk to me about the supervised release terms set forth in the presentence report.

MR. FRERES: I have no objections to any of them, Your Honor, and certainly waive anything the Court needs me to waive regarding all of them.

THE COURT: Well, do you wish me to read them all, or do you waive that?

MR. FRERES: No. That's what I'm referring to. I don't.

THE COURT: You're waiving me providing the rationale as well as --

MR. FRERES: Yes, Your Honor.

THE COURT: -- formally reading them into the record?

MR. FRERES: That's what I meant. Yes, sir.

THE COURT: All right. Thank you.

MR. FRERES: Thank you.

THE COURT: Mr. Welch, what's your

recommendation?

MR. WELCH: May it please the Court and the government.

Your Honor, the Court's determination that Mr. Atwood is a career offender based on what sentencing guideline range that he would face if he was not so designated, I think, already takes into account a lot of what Mr. Freres has argued here as, as aggravation in recommending the high end of the sentence, sentencing guideline range.

Now, I know the Court is not supposed to factor in the sentences received by the codefendants for the similar conduct, but I think the Court knows that those sentences were substantially lower than what Mr. Atwood is facing now, or what he would even be facing if he was not designated as a career offender.

The government has conceded that, as far as the weights involved in the various transactions noted here, they are not significant in federal sentencing ranges that would normally apply to such weights.

Your Honor, the, the guideline range here of 188 to 235 months, I would argue, is a significant amount of time, even at the low end of the guideline range. The sentence the government has recommended, we argue, is, is inappropriate in its length for the offenses that are

before the Court for sentencing.

The -- and, certainly, the Court in a sentencing hearing can consider other evidence of other activity in fashioning a sentence. But, Your Honor, as far as the prior crimes of -- prior crimes that the government has designated as violent and the Court has made so finding, sentences were already imposed for such crimes in the State Courts. They -- they don't all factor back in to where Mr. Atwood finds himself now because the career offender designation is primarily based on the -- or is entirely based on the two prior drug convictions and not on the other, other crimes that are contained in the criminal history; specifically, the, I think the -- or the government made reference to the mob action incident.

Now, regarding the government's request that it take into account activity made reference to in the video recording and then the, the last testimony from Agent Nicholos, we would argue that there's not been a sufficient nexus drawn between Mr. Nicholos's testimony and the description of the incidents involved in the video recording to factor that in in support of a high-end guideline -- the high-end guideline sentence.

The Court made reference to the documentation that was provided as far as rehabilitative efforts and

services that Mr. Atwood is engaged in, letters involved in -- character letters, other letters that were contained in prior filings that we made before this Court. We think that all of those show that Mr. Atwood is a man of, I think, fairly high intelligence. He, from the PSI, you can see that he got involved in drugs and other activity at a very, very young age, Your Honor.

He acknowledges some, some use of drugs, illicit drugs, I think, as young as 11. He was on other drugs, I think, for behavior issues at an even younger age. His criminal activity obviously started when he was a juvenile and continued on up until the present day.

So, Your Honor, Mr. Atwood, I think, got involved in criminal activity, as I said, at a young age; got involved in various drug usage related activity at a young age. And I believe that a lot of that type of behaviors then, as I said, led up and until -- up and through, excuse me, the behaviors that are here today to be sentenced -- or that he's here today to be sentenced for.

Your Honor, as I said, I think that Congress in passing these various provisions to the Sentencing Code that is before the Court -- obviously, I'd ask the Court to do an examination and, a thorough examination of the defendant's behavior and circumstances and his life and

make a decision that comports with all necessary sentencing factors and requirements.

And so again, Your Honor, a sentence of 188 months, I think, is more than adequate for the behaviors that are before the Court today.

Mr. Atwood did plead guilty, saved the government the cost and expense of a trial. He's acknowledged his involvement in this activity; and the issues that he raised in his objections were not necessarily an attempt to deny responsibility, but I think it was an attempt to more recast how that responsibility for the various behaviors that he had pled guilty to should be looked at and factored.

He was claiming, Your Honor, that he was involved in a conspiracy with his two codefendants, but that -- and I'm not going to go into this extensively. We made a written objection. But, Your Honor, his contention is that they were all more or less co-equal participants in this conspiracy and that it took the involvement of all -- and not just one, or not predominantly one, but took the involvement of all -- to effectuate the crime of the delivery of the controlled substance.

Similarly, Your Honor, his argument regarding career offender was, again, not to somehow say that he

had not done those prior transactions in the past; but, Your Honor, to state that due to their location and other factors that this was merely part and parcel of, of the same type of criminal activity.

Your Honor, for all of those reasons, we believe that a sentence, as I said, of 188 months in the Department -- or Bureau of Prisons, excuse me, is more than sufficient punishment for Mr. Atwood's crimes that he has pled guilty to; and, Your Honor, we think that his prior activity is what has placed him in that kind of sufficient -- or, excuse me, substantial penalty category compared to where he would have been. So, Your Honor, we think that a sentence -- sentence at that end recommended by the government is excessive, not necessary, and really not to the benefit of the, of the United States or Mr. Atwood.

Thank you.

THE COURT: Mr. Welch, do you have any objection to any of the proposed terms of supervised release?

MR. WELCH: Other than -- I think we raised that objection --

THE COURT: We struck one, part of one --

MR. WELCH: Right.

THE COURT: -- regarding possession of a

firearm by a felon, although that's a condition anyway.

MR. WELCH: Right.

THE COURT: Do you wish -- so you have no objections other than that -- we made that one correction. So you have no objections remaining?

MR. WELCH: I don't believe so, no, Your Honor.

THE COURT: Do you wish me to read all those --

MR. WELCH: No.

THE COURT: -- out loud along with the rationale, or do you waive?

MR. WELCH: We'd waive that.

THE COURT: All right. Thank you, Mr. Welch.

Well, Mr. Atwood, it's your time to talk to me. You have the right to allocution. If you want to, you can come up here and talk to me. That's -- allocution is a fancy way of saying you have a right to make a statement to me before I impose sentence. If you want to do so, come on up to the podium with Mr. Welch. If you don't want to do so, just tell me you don't want to do so, and that's fine, also.

DEFENDANT ATWOOD: No, Your Honor. I don't.

THE COURT: All right.

All right. I'm taking the sentencing guidelines into account on an advisory basis; and in this case, I really am only using them on a very light

advisory basis.

I'm applying the factors as set forth in 18 USC Section 3553(a). The sentence that I am crafting, I believe, is -- and the sentence that I will impose -- is, in my opinion, sufficient, not greater than necessary, to comply with both the sentencing guidelines and the Section 3553(a) factors.

Although, let me be clear right from the outset: My sentence is driven by the 3553(a) factors; and, in fact, if I have made a mistake in the guideline calculations, if I have made any mistake in a ruling on the guidelines, my sentence would still be the same. My primary decision-making factors that I considered are those under Section 3553(a). That's why I said I lightly considered the guidelines in this case.

I did so -- it's interesting that both sides -- Mr. Freres said, "Go to the top of the guidelines." Mr. Welch said, "Go to the bottom of the guidelines." I wouldn't say I'm ignoring the guidelines because I'm not. I've looked at them. They're a factor that I'm considering. But even if I'm wrong, my sentence would not change.

I've got a situation here with Mr. Atwood. I don't know what Mr. Atwood would have done if he had a chance to go to school, get educated, because he's

clearly very intelligent; and it's not oftentimes I get to see, sort of see behind the mirror of the attorney-client relationship, because he has defense counsel; but I've had a number of letters from Mr. Atwood. He's -- Mr. Atwood is articulate. He's intelligent. He could have been a real contributor to society instead of a criminal.

He clearly is motivated. He's good with interactions with people. Unfortunately, the interactions -- some of them involved criminal activity, which is why he's here. But I read the letters, and I saw the attachments that he offered in mitigation.

If he hadn't gone down the path of criminality, I'm thinking -- most people, I think, would believe he could have done something really good with his life, maybe an owner of a business or someone in a corporation or something of that nature.

Mr. Atwood, that's not what you chose.

When I look at, first, the nature and circumstances of this offense, you were involved in drug trafficking again. You operate as a unit in a group with others. It's not extensive, but you have other people working for you. You're directing things. You're involved in gang activity. That's all very clear. You represent a real danger; and whether or not you're a

career offender under what the sentencing guidelines call a career offender, I would say that you are by nature of you deciding that your career is to be involved in drug trafficking, and your prior sentences have given you no incentive to stop.

I think a lot of that is because a lot of your chances were closed out. Your, your education stopped well before high school. So, you know, you're going to -- realistically, you're going to need a GED at a minimum. I hope when you're in custody not only can you obtain a GED, but you can also take some college classes and get out and find yourself gainfully employed because, frankly, you're -- you are not -- you're not inhibited by a lack of intelligence.

I see some defendants, and I can encourage them to get a better education while they're in prison because I want to give them hope, but I think to myself as I'm doing that: This person, at best, will get out and make, maybe, minimum wage because they have no skills, no motivation; they're not that intelligent.

That's not you. You could actually make something of your life if you chose to do so, but it's a choice you're going to have to make.

So when I look at the nature and circumstances of the offense, they're bad. They, they certainly

justify a sentence toward wherever the guidelines are; but, again, I don't care if the guidelines were there or not.

I've already spoken a little bit of your history and the characteristics. You've got a lengthy record. I'm not considering the offenses that I said I wasn't going to, but anybody taking just a snapshot can see you continually engage in various types of criminal behavior.

The sentence I impose has to reflect the seriousness of the offense. It has to promote respect for the law; and I want it to do so because, obviously, prior sentences have not slowed you down. I, I'm speculating; but, perhaps, in prison even, you increased your criminal skill set.

The sentence has to also provide just punishment, and I think the sentence will do so. I want to make sure it adequately deters you from doing any further conduct, criminal conduct. If I gave you a slap on the wrist, I suspect you would be out and back to your old trade in no time. Along with that, I have to protect the defendant -- excuse me -- the public from further crimes you may engage in.

Now, I think that unless you are incarcerated for a somewhat substantial period of time, the public is

not going to be protected from you. Whether or not the CI in that video I watched was entirely untrustworthy, as I said, I'm not considering anything that person said whatsoever. I'm considering your own words. And I don't know if the shell casings and the bullet holes in the van and the wall recovered that are in the photographs in Government Exhibits 2 through 17, as well as the testimony of Agent Nicholos -- I don't know if that was what you did or not.

What I do know is I heard you talking about shooting up a van and being regretful that you didn't shoot the person in the window of the house; when the person you were with saw them, you didn't shoot that person.

You clearly have violent activity. And I would ask you: When you, when you think of doing violence like that, insert -- instead of you being the person doing the shooting, imagine if it was a rival gang member and imagine the person in the window is the mother of your two children who are in that van or in that living room and the person drives by and shoots them and paralyzes one of your children, kills the other one, and kills the mother -- their mother.

I mean, think about that. How would you like it if that -- or better than that, what if it was both

your mother, the one who lives in Arizona right now, and the mother of your children and your children in that van when someone drove by and shot them up; and you were told that this person was bragging on a video about lighting up that van and shooting up the house and you had a dead mother, a paralyzed child, another dead child, and the mother of those children dead? That should give anybody pause.

So maybe when you go back and you're thinking about what I'm saying today, if you don't remember anything else I say, I want you to think about how that would affect you, because that's what you already did to somebody else. But, again, I'm just considering that as one of the factors in crafting your sentence.

It's also important that you have enough time to get educational and vocational training. As I said, you're going to need to get a GED. You're hopefully going to get some college credit.

You're also going to need some drug treatment because, as your own attorney said, you've got a long history of drug use, drug problems.

I'm considering all those factors. I'm trying to avoid anything unwarranted for a person who is like you, regardless of what the guidelines say. I'm trying to avoid any unwarranted sentencing disparity. So when I

consider all of those factors, I've arrived at a sentence that I think is appropriate.

Let me add one more thing. If I was to express how all the stuff in the -- all the information in the PSR, as well as all the other evidence in mitigation, the letters I received, and then watching the video of you today, Government's Exhibit 1 -- when I combine that all together, if I had to summarize how I feel about crafting a sentence for you, it is essentially -- I could break it down into two words, or two phrases. Disappointment, because I think you could, you could have been a better man. You still can be. But you're going to have to get through some things. So I would say "disappointment," and I would say "necessary" because, unless you have time to readjust your life, you are going to keep selling drugs, and you are going to hurt other people.

And you could have gone -- you could have -- your life could have gone a whole different way. You could have been a much better person.

Pursuant to the Sentencing Reform Act of 1984, the defendant, James Atwood, is hereby committed to the custody of the Bureau of Prisons for a period of 210 months on Count 1 and 2 and 96 months on Count 3, all terms to run concurrent with each other.

The defendant doesn't have the ability to pay a

fine. No fine is imposed.

Following his release from custody, he shall serve a six-year term of supervised release on Counts 1 and 2 and a one-year term of supervised release on Count 3, all to run concurrently with each other.

Within 72 hours of release from custody from the Bureau of Prisons, he shall report in person to the probation office in the district to which he is released.

While on supervised release, he shall not commit another federal, state, or local crime.

He shall not possess a controlled substance.

He shall submit to one drug test within 15 days of release from imprisonment, at least two drug tests thereafter, as directed by the Probation Office.

Pursuant to statute, you shall cooperate in the collection of DNA as directed by the Probation Office or the Bureau of Prisons.

You shall comply with the following additional terms of supervised release. I'm not going to read them all into the record. The Court hereby adopts all of the proposed terms contained within the presentence report as though I had read them out loud into the record. I wish to highlight one of them. But the reasons I am imposing those conditions are as stated in the presentence report, taking into account the objection as to paragraph 105 in

the PSR.

So if anyone looks at this record, they should consider it as though I read all of that into the record because I'm adopting them as though I had spoken them all into the record. Both counsel have waived me reading them in.

I do want to focus on one of the conditions, which is that Mr. Atwood shall not possess a firearm, ammunition, or destructive device.

Just as a warning, Mr. Atwood is now -- by my examination, Mr. Atwood is now an armed career criminal with this conviction. Should he possess a firearm in the future of any kind and be federally prosecuted for that possession of a firearm by a felon -- Mr. Atwood, just so you know: You start off with a mandatory minimum 15-year statutory sentence. So I'm telling you, trying to tell you in a legalistic style and polite way. I'll break it down into much plainer English. When you get out, if for some reason you want to touch a gun, be near a gun -- if you get caught, your minimum sentence is 15 years; and it goes up from there, but your minimum sentence is 15 years.

Basically, at this point in your life, as I said, you need to make better choices. If you don't want to make better choices and you want to make a really bad

choice, get near a firearm, get caught, because, essentially, you'll spend the rest of your life in prison then. That's just friendly advice in plain English.

There is a special assessment of $300 that is imposed, due, and payable immediately.

Mr. Welch, would you like me to recommend that the defendant serve his sentence in Arizona or in --

MR. WELCH: Yes.

THE COURT: It is recommended the defendant serve his sentence in a facility as close to his family in Arizona as possible.

It is further recommended that he serve his sentence in a facility that will allow him to participate in the Residential Drug Abuse Program.

It's also recommended he serve his sentence in a facility that will allow him to maximize his exposure to educational opportunities, especially getting a GED, as well as get him the opportunity to take some college courses or some vocational courses. Mr. Atwood is smart. He needs to get out and get a job; make money honestly.

That's the Court's sentence at this time.

Mr. Freres, do you -- do you want any further explanation for my reasons for imposing that sentence?

MR. FRERES: No, Your Honor.

THE COURT: Mr. Welch, do you want any further

explanation?

MR. WELCH: No.

THE COURT: Mr. Freres, is there anything unclear, confusing? Have I made any mistakes that -- of which you are currently aware that I need to correct?

MR. FRERES: No, Your Honor.

THE COURT: Mr. Welch, anything?

MR. WELCH: No.

THE COURT: Mr. Welch, do you believe I answered all your principal arguments in mitigation?

MR. WELCH: I believe you addressed all of our arguments. Yes.

THE COURT: Mr. Atwood, you have the right to appeal your conviction and your sentence. You can appeal your -- you can appeal your conviction if you believe there is -- somehow your guilty plea was unlawful, it was involuntary, or if there is some other fundamental defect in the proceedings, the guilty plea proceedings, that was not waived by your guilty plea. You also have a statutory right to appeal your sentence, particularly if you think the sentence is contrary to law or I've made some error.

If you wish to appeal, you have to file a Notice of Appeal within 14 days of the entry of judgment or within 14 days of the filing of a Notice of Appeal by

the government. If you request, the Clerk of the Court will prepare and file a Notice of Appeal on your behalf. You can also direct your attorney to file a Notice of Appeal, or you can file one yourself.

If you cannot afford to pay the costs of an appeal or for an attorney to represent you on appeal, you have the right to apply to have the Court waive the filing fee and to ask for a Court-appointed attorney on appeal.

Do you understand your appeal rights?

DEFENDANT ATWOOD: Yes.

THE COURT: Do you have any questions about them?

DEFENDANT ATWOOD: About the appeal rights?

THE COURT: Yes, that I just explained.

DEFENDANT ATWOOD: I only have 14 days?

THE COURT: You have 14 days to file -- within 14 days of the entry of judgment to file a Notice of Appeal. You can -- let me repeat it again to you just so you understand how to do so.

The Clerk of the Court will prepare and file a Notice of Appeal on your behalf. You can also direct Mr. Welch, ask him to file a Notice of Appeal. Or you can file one yourself. Do you understand?

DEFENDANT ATWOOD: I'll have the Clerk file

one.

THE COURT: All right. At this time, I'll direct my courtroom deputy to file a Notice of Appeal on your behalf.

Do you have any other questions about your appeal rights?

DEFENDANT ATWOOD: No.

THE COURT: Okay. Anything further on behalf of the United States?

MR. FRERES: No, Your Honor.

THE COURT: Mr. Welch, anything further?

MR. WELCH: No.

THE COURT: That will be all for the record.

Defendant's remanded to the custody of the United States Marshal Service.

(Hearing concludes, 12:42 p.m.)

* * * * * * * * * * *

REPORTER'S CERTIFICATE

I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated this 29th day of October, 2018.

s/Lisa Knight Cosimini
Lisa Knight Cosimini, RMR-CRR
Illinois License # 084-002998